PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
04/29/99
THOMAS  K. KAHN
CLERK

No. 97-8427

D.C. Docket No. 1:94-CV-0139-RCF

EPL, INC., an Alabama Corporation,

Plaintiff-Counter-
defendant-Appellee,

versus

USA FEDERAL CREDIT UNION, a federally
chartered credit union,

Defendant-Counter-
Claimant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Georgia

---

**(April 29, 1999)**

Before HATCHETT, Chief Judge, BIRCH, Circuit Judge, and KEITH[*], Senior Circuit Judge.

PER CURIAM:

---

[*] Honorable Damon J. Keith, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

Appellant USA Federal Credit Union (USA) appeals the district court's grant of summary judgment in favor of EPL, Inc. (EPL) on USA's counterclaim that sought damages and injunctive relief for EPL's alleged breach of a software license agreement. Because we find that genuine issues of material fact exist regarding (1) whether EPL's development of a translated form of its "VISION" software to operate on an Unisys Series A computer system violated the software license agreement, and (2) whether EPL's invoice for support services in 1994 was a valid demand for payment under the Initial Support Period of the software license agreement, we reverse the district court's summary judgment rulings and remand for trial.

## I. BACKGROUND

On September 28, 1988, USA entered into a ten year software license agreement (agreement) with Norell Financial Services (NFS) that allowed USA to use, translate and modify a specialized type of computer banking software that NFS owned called VISION. At the time the parties entered into the agreement, VISION ran only on one kind of computer system, Unisys Series V. The agreement granted USA a non-exclusive license to translate VISION to operate on the newer Unisys Series A computer system. Under paragraph 1.03(h) of the agreement, NFS allowed USA to

> translate the VISION source code from V series systems architecture to A series systems architecture computer systems and retain a copy of such translated source code, which translated source code and all object code compilations thereof, and all rewritten modules thereof are and shall be licensed programs as defined herein which are and shall remain the exclusive property of NFS. [USA] shall periodically furnish to NFS on magnetic tape, one copy of such translated VISION source code. NFS shall not sell or otherwise market such translated and modified VISION product without the prior written consent of USA . . . .

Subsequent to the date of the agreement, EPL acquired most or all of NFS's assets, including the rights to the VISION software.

2

After signing the agreement, USA began translating the VISION software to operate on the Unisys Series A architecture. In 1993, EPL contracted with The Progeni Corporation (Progeni) to create its own translated version of VISION to operate on the Unisys Series A architecture. USA disputed EPL's ability to translate VISION under the agreement.[1] EPL responded through filing a lawsuit against USA alleging that USA disparaged its copyright of VISION through informing other parties, including Unisys, that "EPL could not market VISION A because of USA's rights and that USA would institute litigation if EPL marketed VISION A." EPL sought a declaratory judgment, injunctive relief and compensatory and punitive damages. USA counterclaimed, alleging that EPL breached paragraph 1.03(h) of the agreement, which prohibited EPL from selling or marketing USA's translated product without USA's permission, and sought injunctive relief and compensatory damages.

USA's counterclaim also alleged that EPL breached part two of the agreement, that contained a "Maintenance and On-going Support Services" contract. Under paragraph 2.01 of the agreement,

> The Software Support Services . . . shall commence upon the first to occur of (i) Customer's first use of either VISION or SLIMS to process Customer's live data or (ii) October 1, 1989, and shall continue for a term of 36 months after Customer's first use of VISION (as translated and modified by Customer from Manufacturer's "V" Series system architecture to Manufacturer's "A" Series system architecture) unless sooner terminated.

Paragraph 2.04 of the agreement, entitled "Expiration of Initial Support Period," provides:

---

[1] According to the deposition testimony of Robert Altman, president of EPL, and Ed Essey, president of USA, the two met regarding EPL's decision to translate VISION to operate on Unisys Series A architecture. Essey informed Altman that USA held the exclusive rights to any translated VISION software and that USA would take legal action if EPL attempted to translate and market VISION software that operated on Unisys Series A architecture.

3

Upon the expiration of the Initial Support Period, Customer shall have the following options with respect to Software Support Services from the expiration of the Initial Support Period until the end of the term of this Agreement (the "Second Support Period"):

(a)     If customer elects to discontinue Software Support Services, Customer shall pay a monthly Software Support Fee commencing on the first day of the Second Support Period and the first day of each month thereafter for the remainder of this Agreement. . . .

(b)     If USA elects to continue to receive Software Support Services, the Software Support Fee payable by customer during each year of the Second Support Period shall be 50 percent of the annual maintenance and support fees charged by NFS for VISION and SLIMS which Software Period commences on each anniversary of such date for the remainder of the term of this Agreement.

USA received support services under the Initial Support Period at the rate of $25,000 per year, beginning in 1991. On January 1, 1994, and again on January 14, 1994, EPL demanded $33,375 for support services for that year. On February 15, 1994, EPL purported to terminate the contract pursuant to paragraph 4.06(a)(i) of the agreement, because USA failed to pay timely for the annual fee.[2] USA tendered payment on February 18, 1994. USA alleged in its counterclaim that the Second Support Period began 36 months after October 1, 1989, and that its payment in mid-February was therefore timely. EPL, in its amended complaint, alleged that USA failed to pay timely for the annual fee and thus breached the agreement.

The district court, in an interlocutory order, found that the language of paragraph 1.03(h) of the contract was unambiguous and meant "that EPL could not sell or otherwise market the VISION A product created by USA. Paragraph 1.03(h) does not in any way limit the marketing or selling of any other VISION A product." The district court supported this conclusion through

_____

[2] Paragraph 4.06(a)(i) permitted EPL to terminate the contract in the event that "Customer shall not pay when due any sum owed to [EPL] and such non-payment continues for more than thirty (30) days after demand by [EPL] . . . ."

4

harmonizing paragraph 1.03(h) with paragraph 7.17 of the agreement, which provided in part that "[EPL] may develop other credit union software products that will compete with or replace VISION and which may execute on "A" Series system architecture . . . ."  The district court therefore set the scope of review for this first issue as, "the only relevant inquiry for the independent expert is whether EPL copied USA's translated VISION product."  Further, the district court instructed the parties that "the review of the source codes and related code should be viewed with an eye to duplication, not general similarity."

Thereafter, the district court considered the parties' motions for summary judgment. With regard to USA's alleged failure to pay timely for the annual 1994 support services fee, the district court granted partial summary judgment in favor of USA. The district court found that the Initial Support Period began when USA "went live" with its data in mid-February 1991, and that payment for the Second Support Period became due 36 months thereafter; thus, the district court found that "USA's tender of payment on February 18, 1994 was timely."

The district court next analyzed EPL's alleged breach of paragraph 1.03(h) of the agreement.  EPL's expert, Dr. William Appelbe, compared USA's modified VISION version 109 program with EPL's VISION 3.0 program, both having been derived from a common ancestor, EPL's VISION 109.1 program.  Appelbe's report focused on the changes, or "patches," that EPL and USA made to the original program to determine "systematic occurrences of similarities in both parties['] patches, which cannot be attributed to coincidence, obviousness, or uniqueness." Appelbe concluded that "beyond any reasonable doubt, [] no measurable copying of program source code has occurred, and its highly unlikely that any copying of the design changes has occurred either."  The district court held that EPL satisfied its initial summary judgment burden.

USA offered the reports of two experts, Paul Kimpel and Dr. Jay Schlag, to rebut Appelbe's report and support its contention that EPL breached the agreement through impermissible copying of USA's translated VISION program. Schlag's report compared USA's modified VISION version 111 program with EPL's VISION 2.0 program, and found duplication of code within these subprograms between 26 and 79 percent, with an average rate of duplication of 50.9 percent. The district court found that Schalg "did not attempt to distinguish between portions of the underlying VISION program that were left unchanged and the 'patches,' or changes, made by the respective parties." Adhering to its scope of review, the district court held that the 50.9 percent overlap that Schlag found between the two programs was not sufficient to show a high degree of similarity between the modified programs, and concluded that "no reasonable trier of fact could conclude by a preponderance of the evidence that EPL is marketing USA's computer program."

EPL filed a motion for reconsideration two weeks before trial, alleging that the district court erred in granting summary judgment in favor of USA on the wrongful termination of the agreement claim. EPL argued that a document that both parties signed in 1989 amended the contract and moved the date for commencement of annual software support services from October 1, 1989, to January 1, 1990, and that "[t]his new date will become the annual renewal date for the remainder of the existing Agreement."[3] The district court granted EPL's motion for

---

[3] The district court recognized that this document was "new" in the sense that the parties had not relied upon it in support of their motions for summary judgment. The document read, in part:

1) EPL will alter the date for the commencement of annual Software Support Services as specified in Part II, Section 2.01 from October 1, 1989 to January 1, 1990. This new date will become the annual renewal date for the remainder of the existing Agreement period.

reconsideration, vacated its previous grant of summary judgment in favor of USA and entered summary judgment in favor of EPL on USA's counterclaim for breach of contract. The district court found that (1) the letter amended the agreement, (2) under Georgia law, a demand for payment of debt – part of which has matured and part of which has not – is a valid demand for payment of the matured debt, (3) EPL's January 1 and January 14, 1994 invoices were demands for payments for services for the 1994 calender year and complied with paragraph 4.06(a)(i) of the agreement, giving EPL the right to terminate for non-payment, and (4) the first month and a half of 1994 was part of the First Support Period and that payment for services during that period was due on January 1, 1994. USA thereafter filed a motion for reconsideration; the district court denied the motion.

## II. ISSUE

The issue we decide is whether the district court erred in granting summary judgment in favor of EPL on USA's counterclaim for breach of the agreement. Specifically, we must decide whether disputed issues of material fact exist concerning (1) whether EPL breached paragraph 1.03(h) of the agreement through copying and marketing USA's translated VISION A program, and (2) whether EPL's invoices of January 1 and 14, 1994, were valid demands for payment for services under the remaining Initial Support Period.

## III. STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment de novo, with all facts and reasonable inferences therefrom reviewed in the light most favorable to the nonmoving

---

2) U.S.A. agrees to bring current all outstanding invoices due to EPL and to agree to remit the annual Software Support Service fees based on the schedule as established in Item I.

7

party.  Hale v. Tallapoosa County, 50 F.3d 1579, 1581 (11th Cir. 1995).  We apply the same standard as the district court.  Rodgers v. Singletary, 142 F.3d 1252, 1253 (11th Cir. 1998).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Clemons v. Dougherty County, Ga., 684 F.2d 1365, 1369 (11th Cir. 1982).

## IV.  DISCUSSION

### A.  Breach of Paragraph 1.03(h)

In establishing the scope of review for this issue, the district court instructed the parties that "the only relevant inquiry . . . is whether EPL copied USA's translated VISION program" and that the expert's "review of the source codes and related materials should be viewed with an eye to duplication, not general similarity."  We agree with the district court that (1) the agreement is unambiguous and barred EPL from selling or marketing USA's VISION A product, and (2) paragraph 1.03(h), when harmonized with paragraph 7.17, does not limit EPL's marketing or selling of any other VISION A product.[4]  The district court, in granting partial summary judgment in favor of EPL, relied upon the expert report of Appelbe, EPL's expert, that focused on changes or "patches" between USA's modified VISION version 109 program and

---

[4] Accordingly, because we agree with the district court that the contract is unambiguous, we also hold that the district court did not err in excluding parol evidence.  See Archer v. Carson, 444 S.E.2d 82, 85 (Ga. Ct. App. 1994).

8

EPL's VISION 3.0 program. According to the district court, Appelbe's analysis focused on three specific issues:

> First, he wanted to see what extent the respective patches were similar. Second, he wanted to determine whether the similarities were caused by exigencies of the COBOL programming language and the Unisys Series A computer environment on which the modified programs were intended to be used. Third, Dr. Appelbe wanted to determine whether the similarities were attributable to "obviousness"; that is, whether the similarities were caused by the fact that it would be obvious to any programmer that a given change or patch should be made in a certain way.

The district court found that EPL satisfied its initial summary judgment burden, and that the burden then shifted to USA to produce evidence that raised a genuine issue of fact that the parties must resolve at trial.

USA produced the reports of two experts, Schlag and Kimpel, which the district court discounted because: (1) the reports focused on similarity between the programs in general, as opposed to the similarity between the parties' patches to the underlying program; (2) Schlag's conclusion -- that a 50.9 percent overlap existed between the two programs (USA's modified VISION version 111 program and EPL's VISION 2.0 program) – was insufficient as a matter of law to establish a breach of the agreement; and (3) Schlag's conclusion that a 50.9 percent overlap existed between the two programs actually strengthened EPL's argument that it did not copy or market USA's modified VISION because "a high degree of similarity between the modified programs would be expected" as they originated from the same ancestor.

USA contends that the district court erred in limiting its review to the patches between the USA and EPL programs because changed lines are not the only object of a conversion effort. USA further argues that the reports of Schlag and Kimpel more accurately analyze and reflect the procedure for comparing two converted programs and that additional record evidence demonstrates that EPL used USA's ideas without its consent in contravention of paragraph

9

1.03(h).[5] Schlag's report compared the expanded source code of sub-programs within the two computer programs, found that an average of 50.9 percent of the lines in these expanded source codes matched and concluded that "from an analysis of the sample sub-programs . . . a significant number of code lines in the USA Credit Union version of V111 are duplicates of the ones in the EPL Vision 2.0 code." Schlag's report also raised several other issues, including: (1) duplicates of earlier code dominate the code, data structure and program structure of EPL's VISION 2.0/3.0 products, including retention of comment lines from early programmers; (2) EPL failed to use any of the new COBOL compilers to develop a "wholly new" product; and (3) EPL retained the same data base structure of the VISION 2.0/3.0 product that it had in the earlier version of the software. Schlag's report also questioned many of Appelbe's findings.

Kimpel, an employee of Progeni who expanded the source codes from the programs that EPL provided to USA, also offered a report that questioned Appelbe's analysis and conclusion. Kimpel raised the following issues: (1) Appelbe's methodology could only analyze for code differences, as opposed to code duplication; (2) Appelbe failed to examine complete VISION products, omitting a majority of the source files from USA and EPL; (3) Appelbe failed to compare the appropriate release levels of VISION; (4) Appelbe based his analysis of EPL-300 on inaccurate data; (5) Appelbe did not restrict his analysis to significant differences; (6) Appelbe presumed "that which is not changed is converted"; and (7) Appelbe's relation of conversion effort to file size is without foundation. Kimpel concluded that

---

[5] Among the evidence that USA argues demonstrates breach of paragraph 1.03(h) is: (1) evidence from Progeni that the availability of USA's source code would provide a "major benefit" to EPL's conversion effort, and (2) evidence indicating that EPL retained a copy of USA's work.

Appelbe's methods for analyzing the EPL and USA source files are too far removed from the actual products to be very useful, let alone determining. He restricts his analysis only to "patch" files, not the full source files, examining out of context only the lines which have been added or changed, and ignoring the lines which were deleted. His methodology does not demonstrate either the presence or the absence of code duplication from USA's products in EPL-300. . . . Appelbe erred in applying his methods: he did not compare appropriate releases of the products, did not examine anywhere near the complete set of source files for either version, and in the case of EPL-300, did not even base his analysis on EPL's actual changes.

We hold that the reports of USA's experts create genuine issues of material fact regarding whether EPL "copied USA's translated VISION program," and that the district court erred in granting partial summary judgment for EPL on this issue. USA, through its experts' reports and evidence, has gone beyond the pleadings and presented competent evidence designating "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 334 (1986). A jury should hear evidence regarding EPL's retention of USA's VISION A product, and decide between the differing methods of analyses of the parties' experts as well as their conflicting conclusions. In other words, a "fair-minded" jury could find, based on the evidence and expert reports of Schlag and Kimpel, that EPL copied and marketed USA's translated VISION program, in contravention of paragraph 1.03(h). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

**B. Breach of Section 2**

On reconsideration, the district court granted partial summary judgment in favor of EPL concerning USA's failure to pay timely for support services for the first month and a half of 1994, or the remainder of the Initial Support Period, and EPL's subsequent termination of the agreement. As an initial matter, we note that EPL did not file a motion for summary judgment on this issue. "[D]istrict courts are widely acknowledged to possess the power to enter summary

11

judgments sua sponte, as long as the losing party was on notice that she had to come forward with all of her evidence." Celotex, 477 U.S. at 326; see also Massey v. Congress Life Ins. Co., 116 F.3d 1414, 1417 (11th Cir. 1997) ("District courts unquestionably possess the power to trigger summary judgment on their own initiative."). The record indicates that USA was on notice and had the opportunity to come forward with evidence of whether EPL terminated the agreement prematurely.[6] Thus, the district court had the power to grant partial summary judgment.

EPL submitted an invoice to USA on January 1, 1994, and again on January 14, 1994, for support services between January 1 and December 31, 1994. The Initial Support Period commenced in mid-February 1991 and lasted 36 months; thus, the Second Support Period began in mid-February 1994. Therefore, a gap existed between January 1 and February 15, 1994, for support services under the Initial Support Period. The invoice, however, detailed charges for the entire year and indicated a higher charge than previous years – which USA computed as charges under the Second Support Period. USA tendered payment on February 18, 1994.

The district court found that a separate agreement between the parties established "the first day of each year of the Initial Support Period as the due date for services to be provided during that year." The district court further found that USA owed EPL a pro rata portion of the annual $25,000 fee for the first month and a half of 1994 under the Initial Support Period. Thus, the district court framed the issue as whether EPL's demands on January 1 and 14, 1994,

---

[6] USA filed: (1) a motion for partial summary judgment on the issue; (2) a brief in response to EPL's motion for summary judgment; (3) a response to EPL's response to USA's motion for summary judgment; (4) a response to EPL's motion for reconsideration; and (5) a motion for reconsideration. Further, the district court afforded USA additional time for further briefing on EPL's motion for reconsideration.

complied with paragraph 4.06(a)(i), giving EPL the right to terminate the contract for nonpayment. The district court, citing Considine Co. v. Turner Communications Corp., held that "under Georgia law a demand for payment of debt, part of which has matured and part of which has not, is a valid demand for payment of the matured amount." See 273 S.E.2d 655, 656 (Ga. Ct. App. 1980). Because the agreement obligated USA to pay for services under the Initial Support Period between January 1 and February 15, 1994, and because this obligation had matured as of the date EPL demanded payment, the district court held that EPL's demand was legally sufficient to trigger payment for the services and that EPL terminated the agreement lawfully pursuant to paragraph 4.06(a)(i) after USA failed to pay timely.

A material issue exists, however, as to whether EPL's invoice was a valid demand for payment for services during the Initial Support Period and complied with paragraph 4.06(a)(i). First, the district court found and EPL admitted that the invoice was for the Second Support Period, and did not demand payment for services under the Initial Support Period, i.e., between January 1 and February 15, 1994. The letter agreement adopted the first day of each year as the due date for yearly services under the Initial Support Period. Second, the invoice indicates the amount USA owed as $33,375 for all of 1994, not the pro rata share that USA owed for services between January 1 thru February 15, 1994 (the Initial Support Period); thus, EPL failed to provide USA with the "sum owed" for the Initial Support Period pursuant to paragraph 4.06(a)(i). Third, the invoice failed to divide the amount USA owed into matured and unmatured components, and instead appeared to USA as a bill for services for 1994 under the Second Support Period (a wholly unmatured amount). USA has thus designated specific facts that show a genuine issue for trial. See Celotex, 577 U.S. at 334. We hold that the district court erred in granting partial summary judgment in favor of EPL, and that a "fair-minded" jury could find that

13

EPL's invoices did not constitute valid demands for payment for services under the remaining Initial Support Period and thus did not comply with paragraph 4.06(a)(i) of the agreement. See Anderson, 477 U.S. at 242.

## V.  CONCLUSION

Based on the foregoing, we conclude that the district court erred in granting partial summary judgment in favor of EPL on two issues that USA raised in its counterclaim. Accordingly, we reverse the district court's summary judgment rulings and remand for trial.

**REVERSED and REMANDED.**