**PLAYMEDIA SYSTEMS, INC.,**
**a California corporation,**
**Plaintiff,**

v.

**AMERICA ONLINE, INC.,**
**et al., Defendant.**

**No. 01CV3506 AHM(EX).**

United States District Court,
C.D. California.

Oct. 25, 2001.

---

Henry D. Gradstein, Bruce E. Van Dalsem, Gradstein Luskin & Van Dalsem, Los Angeles, CA, for plaintiff.

Adrian M. Pruetz, Albert F. Davis, Michael T. Zeller, Diane C. Hutnyan, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA, for defendant.

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

MATZ, District Judge.

## I.

### INTRODUCTION

This is a copyright infringement case. Plaintiff PlayMedia Systems, Inc. ("PlayMedia") claims that the use by defendant America Online, Inc. ("AOL")[1] of PlayMedia's AMP computer software infringes PlayMedia's copyright. The fact of copying, however, is not at issue. AOL freely admits copying the AMP software, but claims it is permitted to do so by a licensing agreement between PlayMedia and Nullsoft, a company later acquired by AOL. PlayMedia argues that AOL's use exceeds the scope of that agreement.

The AMP software, which was developed by PlayMedia, is a "decoder" that serves the function of decoding digital audio files compressed in the MP3 format.[2] PlayMedia licenses AMP to serve as a decoding engine within certain larger software applications that can play MP3 files on personal computers.

In 1999 PlayMedia sued Nullsoft for copyright infringement, claiming that Nullsoft used the AMP software without permission in Nullsoft's MP3 player known as "WINAMP," a stand-alone audio player that plays music on computers that use the Windows operating system. PlayMedia alleged that WINAMP was using, and indeed dependent on, PlayMedia's AMP source code.[3] Nullsoft claimed that its MP3 decoder, which it called "Nitrane," was not derived from AMP source code. PlayMedia sought a preliminary injunction. That triggered the filing of several declarations, including experts' declarations which, among other things, involved comparisons of the source code in Nullsoft's Nitrane product with the AMP source code. One of the key declarants was Nullsoft's founder and WINAMP's creator, Justin Frankel. (His 1999 declaration is discussed below.) Before the hearing on PlayMedia's preliminary injunction motion, however, the case settled. As part of the Settlement Agreement

---

1. The parties have agreed that the correct name and identity of the defendant is AOL even though the defendant initially named in the caption is "AOL Time Warner, Inc."

2. "MP3" refers to an internationally-accepted standard for digital compression.

3. Generally, "source code" consists of human-readable programming instructions and "object code" consists of digital instructions (Is and Os) readable and executable by a computer. *See* M. Nimmer and D. Nimmer, *Nimmer on Copyright* (2001) at ¶ 13.03[F], p. 13–114, n. 271. See also *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1515 at fn. 2 (9th Cir.1992).

PlayMedia granted Nullsoft the license at issue in this case, and in turn Nullsoft paid PlayMedia $7.5 million.

The relevant portion of the Licensing Agreement provides:

PLAYMEDIA hereby grants NULL-SOFT an irrevocable, non-exclusive, paid fully, perpetual worldwide license to versions 0.7.0 through and including 0.7.6 of the AMP source code (and every other version of the AMP source code that has been or will hereafter be made available for download over the Internet for non-commercial royalty-free use) with the right to make, have made, sell, offer to sell, use, copy, display, modify, distribute, prepare derivative works from and distribute in conjunction with WINAMP. NULLSOFT shall have the right to sublicense AMP or derivatives thereof in object code form only for use in conjunction with WINAMP only. This license does not permit NULL-SOFT to sublicense AMP or derivatives thereof as a Stand Alone Product, whether in source code or object code form. Stand Alone Product as used herein means a product that is not distributed with WINAMP or derivatives thereof.

Within a few days after the Settlement Agreement was executed, AOL acquired Nullsoft for AOL stock worth some $90 million and succeeded to Nullsoft's rights as licensee. In October 2000 AOL launched version 6.0 of its popular AOL software. One feature of AOL 6.0 is the "AOL Media Player," which integrates an audio player that can play music files and a video player that can play video files on a personal computer. AOL calls its audio player the "Winamp Engine," and claims that this "Winamp Engine" is only a slightly modified version of WINAMP. AOL admits that its audio player[4] uses PlayMedia's AMP MP3 decoder, but claims that such use is within the scope of the Licensing Agreement.

PlayMedia argues that AOL's use of the AMP MP3 decoder in its audio player violates the Licensing Agreement in two ways. First, PlayMedia argues that AOL is using AMP in conjunction with an audio player that is not "WINAMP." PlayMedia argues that such use constitutes infringement because it exceeds the general grant of the license, which permits AOL to use the AMP source code "in conjunction with WINAMP." AOL responds that its use of AMP does not exceed the scope of the license because its audio player is only a slightly modified version of WINAMP. Moreover, AOL contends, the license permits it to use the AMP source code in conjunction with WINAMP and its derivatives. Because its audio player is a derivative of WINAMP, AOL argues, it has not exceeded the scope of the license.

Second, PlayMedia argues that even if AOL is using AMP "in conjunction with WINAMP," it is sublicensing AMP to AOL users in conjunction with AOL 6.0, in violation of the limited sublicensing grant of the license that permits AOL to sublicense AMP object code for use in conjunction with "WINAMP only." AOL responds that its WINAMP engine is the only software in AOL 6.0 that directly uses the AMP MP3 decoder; therefore, AOL argues, AMP is being used only in conjunction with WINAMP, within the scope of the Licensing Agreement. AOL further re-

---

4. When this order refers to AOL's "audio player," it is referring to the "engine" in the Media Player that is *not* RealPlayer (even though the Court recognizes that RealPlayer also has the ability to play audio files). *See* Biggs Decl. Exhibit D. Throughout this litigation, AOL has referred to this "engine" as the "WinAmp Engine," but the Court believes that this label is conclusory and unhelpful. Instead of referring to the "so-called 'Win-Amp Engine,'" the Court instead will simply refer to this engine as AOL's "audio player."

sponds that the Licensing Agreement cannot be construed to prohibit AOL from embedding WINAMP in a larger software program such as AOL 6.0 because WINAMP needs higher level programs to operate.

Thus, the two basic issues on this motion are (1) whether AOL is using "WINAMP" in AOL 6.0 in a manner intended by the parties to the Licensing Agreement, which requires the Court to answer the question, "What is WINAMP?"; and (2) whether the license prohibits AOL from using AMP in WINAMP when WINAMP is embedded in a larger software program, such as AOL 6.0.

PlayMedia has moved for a preliminary injunction. It seeks to restrain AOL from copying the AMP software into AOL 6.0 or any application other than WINAMP. PlayMedia also seeks an order requiring AOL to remove the AMP code from existing installations of AOL 6.0.

In excellent briefs and spirited in-court examinations, both sides scored various points, but in the end the Court finds:

(1) Although AOL's audio player shares some characteristics with WINAMP and borrows some source code from WINAMP's main program, PlayMedia has established probable success in proving that AOL exceeded the general grant of the license by using AMP source code in conjunction with its audio player, which is not WINAMP.

(2) Although the foregoing finding standing alone is sufficient to warrant injunctive relief, the Court also finds that even if AOL is using the AMP source code in conjunction with WINAMP, PlayMedia has demonstrated probable success in proving that AOL violated the limited sub-

licensing grant because it is sublicensing to its users AMP in object code form other than "for use in conjunction with WINAMP only."

(3) PlayMedia has established irreparable injury and the balance of hardships resulting from the issuance of an injunction does not warrant withholding injunctive relief.

## II.

### *GENERAL OBSERVATIONS*

Conceptually, the parties' contentions appear anomalous at first, especially given that this lawsuit results from and follows in the wake of PlayMedia's suit against Nullsoft. In that case, PlayMedia contended that Nullsoft had no right to use *any* of the AMP code in WINAMP. Now that Nullsoft has acquired the right to use that code in WINAMP, PlayMedia contends that AOL is not making *enough* use of WINAMP in its audio player. Hence the anomaly: the copyright owner-licensor (PlayMedia) faults the previous alleged infringer (Nullsoft/AOL) for not incorporating *enough* of the previously infringing product (WINAMP) into the offending product (6.0 Media Player).

There is no single approach, much less an accepted standard, for evaluating whether in its audio player AOL is using WINAMP, or enough of WINAMP, to constitute compliance with the first sentence of the license. On this issue the parties have at various times compared the source code, the object code, the names of the files in which either source code or object code are stored and the parties' respective views of the "user experience" of each program. At the hearing they also used power point demonstrations and graphic testimony to illustrate their views.[5]

5. Following the initial round of briefs and the first hearing on PlayMedia's motion, the Court issued a questionnaire to counsel. To the extent the Court incorporates the parties' answers in the following analysis, the citation to their respective Responses to Questionnaire will be "RTQ ___."

▮▮▮ The following legal standards control the analysis in the sections that follow. A copyright license must be interpreted narrowly. *Apple Computer, Inc. v. Microsoft Corp.,* 759 F.Supp. 1444, 1456 (N.D.Cal.1991), *aff'd,* 35 F.3d 1435 (9th Cir.1994), *cert. denied* 513 U.S. 1184, 115 S.Ct. 1176, 130 L.Ed.2d 1129 (1995). Copyright licenses are presumed to prohibit any use not authorized. *S.O.S., Inc. v. Payday,* 886 F.2d 1081, 1088 (9th Cir. 1989). A non-exclusive licensee such as Nullsoft/AOL has "no right to re-sell or sublicense the rights acquired unless he has been expressly authorized to do so." *Harris v. Emus Records Corp.,* 734 F.2d 1329, 1333 (9th Cir.1984).

## III.

### WHAT IS WINAMP AND IS AMP BEING USED IN CONJUNCTION WITH IT?

This section of the Court's order focuses on the language in the Licensing Agreement that permits AOL to use the AMP source code "in conjunction with WINAMP." If AOL has used the AMP code in conjunction with something other than WINAMP, AOL has committed copyright infringement. *See S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1087–88 (9th Cir.1989) (use of copyrighted work outside specified limits of license constitutes infringement).

### A. *PlayMedia's Opening Position*

PlayMedia argues that AOL has exceeded the scope of the Licensing Agreement because AOL 6.0 uses the AMP MP3 decoder in its Media Player, but the Media Player does not incorporate WINAMP,

nor is it WINAMP itself. Pl.'s Mot. at 17. Therefore, PlayMedia argues, AOL is not using the AMP source code "in conjunction with WINAMP." PlayMedia supports this argument by pointing out the most basic differences between WINAMP and the AOL Media Player: these two MP3 players have different names, look completely different, and, aside from the fact that they both play digital audio files, they share no common functionality. Pl.'s Mot. at 17.

### B. *AOL's Position*

AOL posits that it has not exceeded the scope of the Licensing Agreement because even though the Media Player contained in AOL 6.0 is not itself WINAMP, the Media Player incorporates WINAMP. Therefore, AOL asserts, the AMP MP3 decoder is being used "in conjunction with WINAMP." In its Opposition Brief, AOL states, in no uncertain terms, that the AOL Media Player integrates WINAMP version 2.6.2: "The AOL Multimedia Player ... has two programs, or engines, that are integrated into it. One engine is RealPlayer.... The other engine in the AOL Multimedia Player is Winamp version 2.6.2 ('Winamp'), which is audio playback software." Opposition at 5. AOL goes on to declare: "The Winamp engine as embedded in the AOL Multimedia Player is a *nearly identical version* of WINAMP 2.6.2 which was Nullsoft's then-current version of its stand-alone WINAMP program." Opposition at 6 (emphasis added); [6] *see also* Biggs Decl. ¶ 12. AOL argues that it only "modified" the WINAMP source code in relatively minor ways. Biggs Decl. ¶ 12.[7]

---

6. "Then-current" in this statement refers to the time that AOL 6.0 was created, not to the time that Nullsoft and PlayMedia entered the Licensing Agreement.

7. AOL claims that it modified WINAMP only as follows: First, AOL created an ActiveX control to integrate WINAMP into the Media Player. Second, AOL "simplified" the WINAMP interface. And third, AOL fixed some programming bugs in WINAMP and "tightened the code," or reorganized some of the AMP code into "a more formal code style." Opposition at 7; Biggs Decl. ¶ 12.

### C. *PlayMedia's Reply*

PlayMedia responded to AOL's Opposition by filing an *ex parte* application to require AOL to produce the source code for WINAMP 2.6.2 so that it could evaluate AOL's claim that the AOL Media Player incorporates a WINAMP engine that is "nearly identical" to WINAMP 2.6.2. The Court thereupon ordered AOL to produce the source code. Although the parties have disputed whether AOL fully complied with that order, PlayMedia did conduct an analysis. It then argues in its Reply Brief ("Reply") that the Media Player does not contain a "nearly identical" version of WINAMP 2.6.2. PlayMedia points out several ways in which the audio player used by the AOL Media Player differs from WINAMP 2.6.2, including, *inter alia,* that the AOL audio player uses only between 4–8% of the WINAMP Basic Software Application, the AOL audio player uses none of WINAMP's resource files (which contain the digitized artwork, or graphics) and the file structures of the two programs are completely different. The largest single component borrowed by AOL from WINAMP 2.6.2, according to PlayMedia, is the AMP MP3 decoder itself.

PlayMedia concedes in its Reply that the Licensing Agreement permits AOL to use a version of WINAMP that was not necessarily the version in existence at the time of the Licensing Agreement. Specifically, it does not dispute that "WINAMP need not be the exact version of the product in existence when the license was granted, since it was understood that WINAMP would continue to be updated, with new versions being released periodically." Reply at 5. But, PlayMedia asserts, the program that AOL calls the "Winamp engine" in its Media Player is "so dramatically different in terms of function, so devoid of WINAMP source code, that it cannot honestly be represented to be WINAMP at all, let alone a 'nearly identical' version of WINAMP 2.6.2." Reply at 1.

Tellingly, in its response to the Court's post-hearing questionnaire, AOL backs away from its prior assertion that the Media Player incorporates a "nearly identical" version of WINAMP 2.6.2. Indeed, it is now clear to the Court that AOL initially overstated its case when it asserted that the two programs are "nearly identical."

### D. *Legal Standards*

▮ Courts apply principles of contract interpretation when interpreting the scope of a Licensing Agreement. *Mendler v. Winterland Production, Ltd.,* 207 F.3d 1119, 1121 (9th Cir.2000); *United States v. King Features Entertainment, Inc.,* 843 F.2d 394, 398 (9th Cir.1988). The parties here dispute the meaning of "WINAMP" as used in the phrase "in conjunction with WINAMP." In interpreting the Licensing Agreement, the Court's job is to determine the meaning and intention of the parties at the time they entered the agreement. 5 CORBIN ON CONTRACTS § 24.5 (1998). At the outset, then, the Court must determine whether PlayMedia and Nullsoft attached the same meaning to the term "WINAMP" at the time they entered the Licensing Agreement. If so, "the contract is enforceable in accordance with that meaning." *Id.*

The term "WINAMP" is vague because the Licensing Agreement only defines WINAMP as a "suite of software programs." PlayMedia Exhibit 11 Recitals ¶ C. Moreover, there are many different versions of WINAMP in existence, and, as PlayMedia concedes, the Licensing Agreement does not restrict the licensee to using any particular version of WINAMP. Extrinsic evidence is therefore admissible to demonstrate what the parties intended by "WINAMP." *King Features,* 843 F.2d at

398 (extrinsic evidence is admissible if evidence demonstrates that the language of a contract is susceptible to different meanings); *see also* 5 CORBIN ON CONTRACTS § 24.7 (1998) ("If the disputed term is vague ... the proffered extrinsic evidence may reveal which of a range of more precise meanings the parties had intended.").

PlayMedia offers some highly probative extrinsic evidence to demonstrate what the parties intended when they used the term "WINAMP" in the Licensing Agreement. Justin Frankel, creator of the WINAMP software and President of Nullsoft at the time of the Licensing Agreement, described WINAMP in detail in a declaration in the prior Nullsoft litigation. PlayMedia Exhibit 6. In that declaration, Frankel explained that WINAMP is one of the leading audio players on the Internet. Frankel Decl. ¶ 2. He described the "current Winamp product," meaning the product in use at the time of the prior Nullsoft litigation, as:

> a general purpose audio player that plays digital audio files stored in a variety of formats, including those known in the industry as MP3, MP2, MOD, CD, WAV, MIDI and others. Winamp runs on personal computers using the Windows ... operating systems, and includes a user-friendly graphical interface that mimics a standard stereo system. Winamp also has advanced features for an audio player such as a graphic equalizer, a play-list manager,

visualization, a sounds effects module, and a minibrowser.

Frankel Decl. ¶ 5.[8]

PlayMedia asserts, and AOL does not dispute, that the contested language in the Licensing Agreement derives from the following statement in paragraph six of Frankel's declaration: "Winamp [uses] a flexible and extensible architecture. Separate stand-alone pieces of software known as 'plug-ins' provide core and enhanced functionalities for Winamp. Specifically, separate plug-ins work *in conjunction with Winamp* to provide the functionality of decoding specific audio file formats...." (emphasis added). Van Dalsem Supp. Decl. ¶ 12. The AMP MP3 decoder is one of the plug-ins to which Frankel was referring. *Id.*

Frankel's declaration also included a diagram that illustrates how WINAMP works in conjunction with various plug-ins. Frankel Decl. ¶ 6. Several boxes are contained in the "Winamp" box, including the playlist manager, the user interface, the output manager (for outputting sound to the computer), the DSP manager (for sound effects plug-ins), the main interface, the visualization manager (for visual effects plug-ins), and the input manager (for getting decoded information from the various audio file decoders, including the MP3 decoder).

PlayMedia argues that at the time Nullsoft and PlayMedia entered the Licensing Agreement, the parties understood that the license permitted Nullsoft to use the

---

8. Some of these features are depicted in a document that was marked as Court Exhibit 1, which is attached to this Order. That exhibit was developed by the Court's Special Advisor, David Kay, Lecturer in Computer Science in the Department of Information and Computer Science at the University of California, Irvine. He was appointed pursuant to the Court's inherent authority. *See, In re Peterson,* 253 U.S. 300, 312, 40 S.Ct. 543, 64 L.Ed. 919 (1920); Fed.R.Evid. 706. The parties displayed exemplary cooperation with each other and with the Court in recommending the Special Advisor and consenting to his appointment, which proved invaluable to the Court. It should be noted that in Box K of Court Exhibit 1, Mr. Kay referred to the AOL audio player as "Winamp in the AOL Media Player," a term that this Order does not use. *See supra* note 4.

AMP code in the WINAMP audio player in the same manner that Frankel had detailed in his declaration, "namely, permitting its use and distribution 'in conjunction with Winamp only.'" Pl.'s Mot. at 11 (emphasis added).

PlayMedia's argument is supported by Bruce Van Dalsem, the lawyer who represented PlayMedia during the prior Nullsoft litigation. Van Dalsem states that when Mark Kittredge, who represented Nullsoft during the prior litigation, first sent him a draft of the Licensing Agreement, it did not contain any product restrictions. Van Dalsem Supp.Decl. ¶ 9. Van Dalsem changed the Licensing Agreement to add the phrase "in conjunction with Winamp" at the end of the first sentence of the license in order to "limit[ ] Nullsoft's right to use AMP to the Winamp product." *Id.* ¶ 12. Van Dalsem understood that the AMP MP3 decoder "plugged in" to the main Winamp program, winamp.exe, and he used the phrase "in conjunction with Winamp" to capture this fact. *Id.* ¶¶ 12–13.

This extrinsic evidence is helpful, but it does not entirely resolve the vagueness inherent in the Licensing Agreement. The reference to "WINAMP" remains vague because, as Frankel stated in his declaration, "Winamp [uses] a flexible and extensible architecture." Frankel Decl. ¶ 6. WINAMP itself has many different components, and different versions of WINAMP use varying types and numbers of these components. Moreover, as with all computer software, WINAMP's code has evolved with later versions. This is another reason why it is difficult to ascertain what, precisely, the parties intended by "WINAMP."

Despite the vagueness problem, the Court is convinced that the various characteristics of WINAMP described by Frankel in his declaration can and should serve as a benchmark for determining whether AOL is using the AMP source code "in conjunction with WINAMP." Van Dalsem's declaration establishes that PlayMedia and Nullsoft intended that the AMP source code would be used in the manner Frankel described, namely by "plugging in" to WINAMP's main program, winamp.exe. Even though PlayMedia does not (and cannot) state with precision what the parties intended by "WINAMP," PlayMedia may prevail by demonstrating that AOL's product differs so dramatically from the product described by Frankel that it necessarily falls outside of what the parties intended when they used the term "WINAMP."

### E. *PlayMedia Has Established That It Is More Probable Than Not That The Audio Player In AOL's Media Player Is Not "WINAMP" For Purposes of the "In Conjunction With WINAMP" Requirement*

The first step in this analysis is to determine the appropriate methodology for comparing AOL's audio player with WINAMP. The parties have proffered competing methodologies.

#### 1. *AOL's Proposed Methodology*

AOL would have the Court focus exclusively on the "core functionality" of the two software programs. AOL RTQ at 13. AOL defines the "core functionality" or "essence" of WINAMP, regardless of which version, as its ability to select a computer music file, decode it, and output the sound on a computer. AOL RTQ at 4. Because AOL's audio player shares this "core functionality" with WINAMP, the "essence" of WINAMP is present in AOL's Media Player. If so, AOL argues, that is sufficient for the Court to find that AOL is using the AMP MP3 decoder "in conjunction with WINAMP."

### 2. AOL's Methodology Has Two Major Flaws

AOL's methodology is flawed for two main reasons. First, it is too broad because it is dependent on the fact that both WINAMP and AOL's audio player can decode MP3 files. As will be explained in more detail below, because all of the code and functionality for decoding MP3 files is provided by the AMP MP3 decoder itself, the ability to decode MP3 files cannot possibly be the "essence" of WINAMP. Second, AOL's methodology is too narrow because it minimizes the importance of source code and resource file comparisons, as well as comparisons of the two audio players' features. The Court agrees with PlayMedia that all of these comparisons are relevant to the determination whether "WINAMP" is present in the AOL audio player.

### 3. The Structure of WINAMP

There are three primary components that make up WINAMP.

#### a. Audio Input and Output Plug–Ins

The first component consists of the various *audio input plug-ins* that input decoded audio information into a main program. PlayMedia's Exhibit 38; PlayMedia RTQ at 1. A plug-in is "a computer file used to alter, enhance or extend the operation of a parent application." Billett Decl. ¶ 14. The AMP MP3 decoder is an example of an audio input plug-in because, when used, it decodes a sound file in the MP3 format and then inputs that information into

WINAMP's main program.[9] PlayMedia RTQ at 1. The second basic component of WINAMP consists of *audio output plug-ins*. As the name suggests, these plug-ins take information from WINAMP's main program and output it to the computer. All versions of WINAMP have at least the wave output plug-in. PlayMedia RTQ at 2.[10]

#### b. The Main Program: winamp.exe

The third basic component of WINAMP—and the most important component for purposes of the Court's analysis—is the main program, which is referred to by the parties as "winamp.exe," or the WINAMP Basic Software Application. Winamp.exe is the "stand-alone executable," and is the basic software application to which other components, such as the AMP MP3 decoder, plug-in. Billett Decl. ¶ 15. Winamp.exe does not have the capacity to decode audio files; it provides the code and functionality for everything other than decoding such files and outputting music to the computer. Frankel Decl. ¶ 8. "Everything else" includes allowing the user to change the appearance of WINAMP's interface, to adjust the music control levels, and to manage a playlist. Frankel Decl. ¶ 6. Winamp.exe provides the user with "scores of interface features, from everything having to do with the sound and playing of music, to browsing on the Internet for music information." PlayMedia RTQ at 4.

All versions of WINAMP—whether Lite, Minimal, or Standard [11]—use at least: (1) the same version of winamp.exe, (2) the

---

**9.** In the standard version of WINAMP, seven audio input plug-ins are provided in addition to the MP3 decoder. These plug-ins permit the user to listen to Windows Media files, wave files, Midi files, Mjuice files, and Audiosoft files. Plug-ins are not restricted to audio; the standard version of WINAMP also includes an enhanced visualization plug-in that permits users to watch a light show while listening to music. *See* Box H in Court Exhibit 1.

**10.** In the standard version of WINAMP, two audio output plug-ins are provided in addition to the wave output plug-in. These additional plug-ins permit the user to output "Direct Sound" and to copy music to a disk. Exhibit 38.

**11.** These are the terms the parties use to describe different installations of WINAMP. In the minimal installation of WINAMP, the main program comes with one audio input

AMP MP3 decoder (a.k.a. the MP3 input plug-in), and (3) the wave output plug-in. PlayMedia RTQ at 1. Versions of WIN-AMP differ from other versions only insofar as they have different numbers and types of plug-ins. Billett Decl. ¶ 16. For example, one version of WINAMP may give the user the ability to copy music to a disk because, in addition to the wave output plug-in, it has the "Out Disk Output Plugin." PlayMedia Exhibit 38. Another version of WINAMP may give the user the ability to listen to Midi files because, in addition to the AMP MP3 Input Plugin, it has the "Midi Input Plugin." PlayMedia Exhibit 38. But, no matter how many different plug-ins are used, all versions of WINAMP necessarily use the main program, winamp.exe.

#### 4. *AOL's "Core Methodology" Test Is Too Broad and Too Narrow*

The respective capacities of WINAMP and AOL's audio player to decode software are a constant, because both programs use the AMP MP3 decoder. The question is whether the AMP MP3 decoder is being used in conjunction with a product for which it is licensed; thus, the decoder (and the function it performs) cannot logically be a part of this analysis. AOL's "core functionality" test makes relevant that both programs can decode music files, but the Court agrees with PlayMedia that this is not a relevant point of comparison. In this sense, AOL's methodology is too broad.

But AOL's methodology also is too narrow because to answer the question, "What is WINAMP?", one must determine what WINAMP does, *apart from* its ability

to decode music files. AOL's methodology ignores that determination. All of the features Frankel described as being part of WINAMP—the playlist management, the interface, and the minibrowser, for example—are supplied by the source code in winamp.exe. Frankel Decl. ¶ 5. Moreover, Van Dalsem crafted the phrase "in conjunction with Winamp" in the Licensing Agreement to reflect the fact that the AMP MP3 decoder "plugged in" to winamp.exe. Van Dalsem Supp.Decl. ¶¶ 12–13. Therefore, the Court agrees with PlayMedia that whether "WINAMP" is in AOL's Media Player should be determined in large part by the presence or absence of winamp.exe in AOL's Media Player. In short, a source code and resource file comparison of the two programs is highly relevant in determining the extent to which WINAMP is present in AOL's Media Player.

In addition, as explained more fully below, the Court agrees with PlayMedia that because the source code from winamp.exe that *is* present in AOL's Media Player may have been commented out (i.e. is present but made inoperable) [12] or supplemented to operate differently, a functional comparison of the two programs is also relevant. This functional comparison should not be restricted to the programs' ability to decode and play music. Rather, the Court will take into account the several so-called "ancillary" features that make WINAMP a unique audio player.

#### 5. *Source Code and Resource File Comparison*

In attempting to demonstrate the absence of winamp.exe in AOL's Media Play-

---

plug-in and one audio output plug-in. PlayMedia RTQ at 2. In the Standard installation of WINAMP 2.6.2, the main program comes with seven additional audio input plug-ins, an enhanced visualization plug-in, and two additional alternative output plug-ins.

**12.** Source code that has been "commented out" is present in the program but "is not compiled and is absent from the executable object code precisely as if it never existed." Billett Decl. ¶ 30.

er, PlayMedia stresses that, at most, only 8% of the source code from winamp.exe is contained in the AOL Media Player. Billett Decl. ¶ 13; PlayMedia RTQ at 13. PlayMedia obtained this percentage by comparing the source code from WINAMP 2.6.2's winamp.exe with the source code in the corresponding AOL "main program," which is called ampx.dll. Billett Dec. ¶ 17. This comparison reveals that, of the total 16,366 lines of source code in winamp.exe, ampx.dll uses between 1277 and 1337 of these lines, or about 8%.[13]

AOL responds to this argument by pointing out that even though it only uses 8% of winamp.exe in its audio player, the code that it borrowed from WINAMP as a whole makes up 92.4% of its audio player. AOL urges the Court to look not at what AOL left behind in WINAMP, but at the fact that so much of AOL's audio player is made up of WINAMP code. AOL RTQ at 7.

But in fact, AOL includes in the 92.4% figure the AMP MP3 decoder source code, and the Court has already determined that the presence of the AMP source code is not relevant to determine whether AMP is being used in conjunction with WINAMP or whether WINAMP is present in AOL's audio player. Once the AMP source code is removed, the 8% of winamp.exe taken out of WINAMP 2.6.2 actually comprises about 63% of the corresponding AOL main program, ampx.dll. Stated another way,

ampx.dll contains 37% new code written by AOL. PlayMedia RTQ at 7.

AOL contends that even the 63% figure is sufficient for the Court to conclude that AOL is using the AMP MP3 decoder "in conjunction with WINAMP." It argues that a court could conclude in a "typical" copyright case that ampx.dll is, as a matter of law, a derivative of winamp.exe. AOL RTQ at 10 & n. 11 (citing cases in which courts concluded that a subsequent work was a "derivative" of an earlier copyright-protected work, and therefore, that infringement had occurred).[14] According to AOL, because ampx.dll would be considered a derivative of winamp.exe in a "typical" copyright infringement suit, this Court should conclude that the AMP MP3 decoder is being used in conjunction with WINAMP.

The Court is not persuaded by this argument. The cases cited by AOL all involve the question whether a subsequent computer program infringed an earlier, copyright-protected program because it was impermissibly "based upon" the earlier program. *See, e.g., Integral Systems, Inc. v. Peoplesoft, Inc.,* 1991 WL 498874, at * 11 (N.D.Cal.1991) (citing Copyright Act, 17 U.S.C. § 106, which defines a "derivative work" as "a work based upon one or more preexisting works"). In the context of these cases, even if the subsequent program borrowed very little of the previous program, a court could still conclude that the subsequent program was a "derivative"

13. Dr. Billett stated that the AOL Media Player contains only 4.1% of unmodified WINAMP 2.6.2 source code. Billett Decl. ¶ 13. After Dr. Billett made this statement, the parties disagreed about whether two "support libraries" used by WINAMP 2.6.2 when it compiles should be counted as "part" of WINAMP. PlayMedia RTQ at 13; AOL RTQ at 12. The Court will assume, without deciding, that these libraries should not be counted as part of WINAMP. When the source code for the libraries are not included in the analysis, the AOL Media Player contains about 8% of winamp.exe. PlayMedia RTQ at 13.

14. The cases cited by AOL are *Rebis v. Universal CAD Consultants, Inc.,* 1998 WL 470475, at *3 (N.D.Cal. Aug.11, 1998), *EPL, Inc. v. USA Federal Credit Union,* 173 F.3d 1356, 1360–62 (11th Cir.1999), *Montgomery v. Noga,* 168 F.3d 1282, 1292 (11th Cir.1999), *United States v. Manzer,* 69 F.3d 222, 227 (8th Cir.1995), and *Integral Systems, Inc. v. Peoplesoft, Inc.,* 1991 WL 498874, at *11 (N.D.Cal. 1991).

if it was comprised mostly of the previous program.

The infringement question in those cases—whether a subsequent program was "based upon" an earlier program—is very different from the infringement question in this case, which is whether WINAMP is present in AOL's product in a manner the parties to the Licensing Agreement intended. At best, AOL's argument demonstrates that, in a "typical" copyright infringement case, its audio player might be found, as a matter of law, to be a derivative of WINAMP. The parties to the Licensing Agreement did not intend that Nullsoft could use the AMP source code "in conjunction with a product that could be found, in a 'typical' copyright case, to be a derivative of WINAMP." Instead, the parties intended the AMP code to be used "in conjunction with WINAMP." That so much of winamp.exe's code is *missing* from AOL's audio player is more relevant to demonstrating infringement in this context than the fact that some 63% of ampx.dll is comprised of winamp.exe's source code. Accordingly, AOL's argument, while initially appealing, ultimately is not persuasive.

AOL makes the additional argument that it is not violating the terms of the Licensing Agreement because the agreement permits it to distribute the MP3 decoder as part of another product so long as that product is a derivative of WINAMP. Because AOL is distributing the MP3 decoder with a derivative of WINAMP, AOL argues, it has not exceeded the scope of the Licensing Agreement. Opposition at 11. AOL states: "Nothing in the license requires AOL to use only the current stand-alone version of Winamp, but to the contrary the license expressly permits AOL to distribute the MP3 decoder in conjunction with Winamp and its derivatives." Opposition at 12.

But the license does not, in fact, permit AOL to use or distribute AMP in conjunction with WINAMP and its derivatives. A careful parsing of the agreement reveals that it grants the licensee two separate rights: first, the general right to use AMP (in source code form) "in conjunction with WINAMP," and second, the limited right to sublicense and distribute AMP (in object code form only) for use "in conjunction with WINAMP only." [15] Neither the general use grant nor the limited sublicensing grant permits the licensee to use or sublicense AMP "with WINAMP *or derivatives of WINAMP*." All of the actions described in the general use grant [16]—including "prepare derivative works from"—refer to AMP, not WINAMP. The language contained in the parenthetical permits AOL to use future versions of AMP that may be created by PlayMedia.

So where does the concept that AOL relies on—"derivatives" of WINAMP—come from? It comes from the license's *additional* prohibition against Nullsoft distributing AMP or derivatives thereof as a "Stand Alone Product." Such a product is defined to be "a product that is not distributed with WINAMP *or derivatives thereof.*" (Emphasis added).[17]

---

15. PlayMedia also argues that AOL exceeded the scope of the limited grant by distributing AMP in conjunction with AOL 6.0, and not in conjunction with "WINAMP only." The Court addresses this argument in the next section of this Order.

16. This section states: "PLAYMEDIA hereby grants NULLSOFT [a] ... license to ... the AMP source code (and every other version of the AMP source code that has been or will

hereafter be made available for download over the Internet for non-commercial royalty-free use) with the right to make, have made, sell, offer to sell, use, copy, display, modify, distribute, prepare derivative works from and distribute in conjunction with WINAMP."

17. This section states: "This license does not permit NULLSOFT to sell, license, or otherwise distribute AMP or derivatives thereof as

AOL argues that this reference permits it to use AMP with any derivative of WINAMP. Kittredge Decl. ¶ 4 (supporting the view that AOL can use AMP with any derivative of WINAMP because "paragraph 9 [of the Licensing Agreement] specifically refers to 'WINAMP or derivatives thereof.' "). But this *additional prohibition* on AOL's use of AMP cannot be construed to *permit* AOL to use or distribute AMP with derivatives of WINAMP. The language in the last two sentences of Paragraph 9 does not augment AOL's rights under either the general or limited grants of the license.[18] The purpose of this prohibition, rather, was "to address PlayMedia's stated concern that … Nullsoft would be able to distribute or license the AMP decoder or its derivatives to third parties as a separate product by itself in direct competition with PlayMedia." Kittredge Decl. ¶ 3; *see also* Van Dalsem Supp.Decl. ¶ 16. AOL is simply wrong when it asserts that this additional prohibition "expressly permits AOL to distribute the MP3 decoder in conjunction with Winamp and its derivatives."

Given that PlayMedia concedes that it was not the intent of the parties to prohibit the licensee from using AMP in conjunction with different *versions* of WINAMP,[19] why can't AOL use AMP in conjunction with a derivative of WINAMP? Is there a

difference between a "version" and a "derivative"? The parties do not directly address this question, but the Court thinks that there is a distinction, and it is important.

The parties often refer to different "versions" of WINAMP, and these references are always to different incarnations of the stand-alone WINAMP program freely made available by WINAMP's owner (now AOL) to users for download on the Internet. *See, e.g.* Biggs. Decl. ¶ 14 (discussing WINAMP versions 2.6.2 and 2.7.6, and describing WINAMP 2.7.6 as "a version of the stand-alone Winamp program that was developed after the release of AOL 6.0"); Karplus Decl. ¶ 31 (discussing aspects of the object code in WINAMP version 2.5); *id.* ¶ 46 (discussing how Nullsoft removed the AMP decoder in WINAMP version 2.2); Billett Decl. ¶ 26 (discussing the "updates to Winamp between version 2.6.2 and version 2.7.6"). However many versions of WINAMP there may be, PlayMedia has demonstrated that all versions of WINAMP, which are available for download at *www.winamp.com.* have at least three basic components: the MP3 audio input plug-in, winamp.exe, and the wave audio output plug-in.

That this is the meaning, or at least the reference point, for a "version" of WINAMP is further supported by the manner

---

a Stand Alone Product, whether in source code or object code form. Stand Alone Produce as used herein means a product that is not distributed with WINAMP or derivatives thereof."

18. Van Dalsem, PlayMedia's lawyer during the prior Nullsoft litigation, puts it this way: "The Stand Alone Product restriction was intended as just that, a restriction. It was not intended to expand any of Nullsoft's rights. Just because a product is not a Stand Alone Product does not mean that it is otherwise with[in] the scope of the source code license or the object code license." Van Dalsem Supp.Decl. ¶ 17.

19. Van Dalsem, who represented PlayMedia during the prior Nullsoft litigation, states: "Mr. Kittredge [Nullsoft's lawyer] is correct that PlayMedia did not request a provision that would 'lock' Winamp as it then existed. I understood and expected that the Winamp product would continue to be updated and improved, with new versions being released. I am familiar with the numerous versions of the Winamp product that have been released by Nullsoft during the past two years and those updates to Winamp are entirely consistent with what I understood would happen to the Winamp product following the grant of the license." Van Dalsem Supp.Decl. ¶ 19.

in which the parties use the word in the context of AOL's software and the AMP program. For example, AOL's expert, David Biggs, explains that " 'AOL 6.0' is version 6.0 of AOL's access software and is the most recent version that has been released to the public." Biggs Decl. ¶ 3. Biggs also states that "[p]rior versions of AOL's access software include versions 1.0 through 5.0. . . . AOL plans to release AOL version 7.0 of its access software in the fall of 2001." These statements tend to support the Court's conclusion that a "version" of a computer program is not simply any program that derives from a prior program; rather, a "version" is a new incarnation of a program that is released to the public by the owner of the program.

But "version" is not synonymous with "derivative." The Licensing Agreement itself draws a distinction between a "derivative" and a "version." Paragraph 9 grants Nullsoft a license "to versions 0.7.0 through and including 0.7.6 of the AMP source code" as well as a license to "every other version of the AMP source code that has been or will hereafter be made available for download over the Internet for non-commercial royalty-free use." The license goes on to grant Nullsoft the right to "prepare derivative works" from AMP "in conjunction with WINAMP." These

terms and provisions suggest that a "version" of AMP is an incarnation of AMP made available by AMP's owner—PlayMedia—while a "derivative" of AMP is a different incarnation of AMP created by a third party—Nullsoft.

Given this distinction between "version" and "derivative," PlayMedia's position makes sense. Essentially, it is arguing that AOL may use AMP only in conjunction with an incarnation of WINAMP that would be available for download at www.winamp.com. The Court agrees that, under the terms of the Licensing Agreement, this is not the same as using AMP in conjunction with a derivative of WINAMP. The latter is not authorized. Rather, AOL must show that it is using a version of WINAMP.[20]

PlayMedia further bolsters its argument that AOL's audio player is not a version of WINAMP by going beyond a source code comparison. It also points out that AOL's audio player does not use any of the resource files that are used by WINAMP 2.6.2. Resource files contain all of the digitized artwork, or graphics, used by the WINAMP graphical user interface, i.e. what the user sees when s/he uses WINAMP. Billett Decl. ¶ 20. The resource files are not expressed as source code, but are essential to the WINAMP program. *Id.* AOL does not dispute that it uses none

---

**20.** The Court agrees with PlayMedia that "WINAMP" in the Licensing Agreement should not include WINAMP 0.20a, the original release of the stand-alone WINAMP player. Smith Decl. ¶ 25. WINAMP 0.20a did not use plugin architecture and only consists of a single executable file. Van Dalsem Supp. Decl. ¶ 23. Accordingly, it does not meet the definition of WINAMP contained in the Licensing Agreement, i.e. that WINAMP is a "suite of software programs." This version of WINAMP predated the prior Nullsoft litigation, and Van Dalsem was unaware of the existence of WINAMP 0.20a at the time he helped PlayMedia negotiate the Licensing Agreement with Nullsoft. Van Dalsem Supp.

Decl. ¶ 21. In contrast, the version of WINAMP that was in existence at the time of the Nullsoft litigation, WINAMP 2.2.1, looks "the same" as WINAMP 2.6.2, and uses the plugin architecture. Van Dalsem Supp.Decl. ¶ 20. WINAMP 2.2.1 meets the "suite of software programs" definition because it consists of several programs that work together, including the main Winamp application, winamp.exe, and numerous other plugins. On the basis of Van Dalsem's declaration, the Court holds that comparisons of AOL's audio player with versions of WINAMP that predate the Licensing Agreement are irrelevant to this analysis.

of WINAMP's resource files. This comparison explains why the Media Player does not look like WINAMP from the perspective of the user. Billett Decl. ¶ 21.

AOL challenges the source code and resource file comparisons PlayMedia proffers, primarily on the basis that a source code and resource file comparison is irrelevant because the Court should restrict its analysis to a comparison of the "core functionality" of the two programs. The Court has already rejected this argument.

AOL also objects that PlayMedia's source code comparison is invalid because PlayMedia uses WINAMP 2.6.2 as the relevant point of comparison. The Licensing Agreement does not restrict the licensee to using the AMP MP3 decoder in conjunction with any particular version of WINAMP, and there may be other, smaller versions of WINAMP that have source code more similar to the source code in AOL's audio player.

PlayMedia persuasively responds by pointing out that WINAMP 2.6.2 has been the relevant point of comparison throughout this litigation because *AOL itself* asserted, from the beginning, that its Media Player incorporated a "nearly identical version of WINAMP 2.6.2." Opposition at 6. Based on this assertion, PlayMedia requested from AOL the source code for WINAMP 2.6.2 so that it could verify AOL's claim. Billett Decl. ¶ 10. Until PlayMedia demonstrated that at least 92% of WINAMP 2.6.2's main program was missing from the AOL Media Player, AOL maintained that the 2.6.2 version was the relevant point of comparison. It is only fair that PlayMedia have *some* point of comparison for evaluating AOL's claim that WINAMP's code is present in AOL's product, and that the 2.6.2 version be that

basis. AOL has not given PlayMedia the source code for any other version of WINAMP, nor has it demonstrated that a different comparison would yield a greater degree of similarity between WINAMP and AOL's product, apart from version 0.20a, which the Court declines to consider. *See supra* note 20.

AOL next objects that it is not enough for PlayMedia to compare the source code from the two programs' main executables. Rather, PlayMedia should also be required to compare the source code from their plug-ins. PlayMedia persuasively responds that whether WINAMP 2.6.2 and the AOL audio player share plug-ins is not really the heart of the inquiry because the AMP MP3 decoder works by plugging into winamp.exe. It is not disputed that audio input plug-ins like the MP3 decoder are never used with each other at the same time. Rather, the main program can use only one audio input plug-in at any given time. Moreover, the plug-ins do not "plug in" to each other; they *only* "plug in" to the main program. And even if *all* of WINAMP's plug-ins were present in AOL's audio player, it would still not be accurate to state that the AMP MP3 decoder was being used "in conjunction with WINAMP" if none of winamp.exe was present in AOL's audio player. This view is confirmed by Frankel's description of WINAMP in his declaration, where he states that the input, output and visualization plug-ins are not part of WINAMP, but are "separate, stand-alone pieces of software" that interact with WINAMP. Frankel Decl. ¶ 6; *see also* Billett Decl. ¶ 17 n. 1. The AMP MP3 decoder is only used "in conjunction with" a main executable program. Therefore, the main executable program should be the focus of the inquiry.[21]

---

21. PlayMedia argues that even if it wanted to compare the programs' plug-ins, AOL failed to produce an unadulterated version of the source code for the WINAMP 2.6.2 plug-ins.

Billett Decl. ¶ 17. In addition, PlayMedia argues that even assuming that the plug-ins taken from WINAMP 2.6.2 and used in the AOL audio player are an exact match, those

Finally, PlayMedia urges the Court to consider what is in the AOL audio player that is *not* in WINAMP 2.6.2. AOL's audio player needs substantial AOL code to operate, none of which has been produced by AOL to PlayMedia. If all of the code written by AOL were taken out of ampx.dll, the main executable in AOL's audio player, the player would not be able to play music.

The Court will now proceed to a functional comparison of the two audio players.

### 6. *Functional Comparison*

A functional comparison has intuitive appeal: if AOL's Media Player doesn't walk like WINAMP, look like WINAMP, or quack like WINAMP, it's probably not WINAMP. Aside from its intuitive appeal, a functional comparison is relevant because Frankel's declaration describes WINAMP more in terms of its functions than in terms of source code or resource files. He described WINAMP's "user-friendly graphical interface that mimics a standard stereo system," and its "advanced features," including "a graphic equalizer, a play-list manager, visualization, a sound effects module, and a mini-browser." The parties intended the licensee to use the AMP source code "in conjunction with" a product that possessed these features. Therefore, if AOL's product lacks these features, AOL

is using the AMP source code in a manner . not authorized by the Licensing Agreement.[22]

A functional comparison of WINAMP 2.6.2 and the AOL Media Player weighs heavily in PlayMedia's favor because the AOL Media Player looks and performs very differently from WINAMP. *See* Billett Decl. ¶¶ 33–46 (listing numerous ways in which WINAMP and the Media Player differ in terms of features). For example, the Media Player has the dual capability to play audio and video files. Biggs Decl. ¶ 6. If a user opens a video *or* audio file, the Media Player is launched. *Id.* The Media Player is capable of playing video files because, in addition to its audio player, it incorporates RealPlayer, a third-party software program that plays back certain types of video and audio files. Biggs Decl. ¶ 7. In contrast, WINAMP only has the ability to play audio files, and cannot play video files.

Aside from having disparate functions, WINAMP and the Media Player look different.[23] AOL concedes that it "changed the user interface feature set normally displayed with the WINAMP standalone product . . . . so that the AOL Media Player user interface would be simpler to use by typical AOL subscribers and would allow for a uniform [graphical user interface] regardless of whether the Winamp or

---

plug-ins (other than the MP3 decoder) as measured by object code (because the source code has been changed, albeit slightly) only account for 163,328 bytes out of the total 1,292,945 bytes (or 11.8%) contained in the WINAMP plug-ins directory. Therefore, AOL has only taken a fraction of WINAMP 2.6.2's plug-ins.

**22.** A functional comparison is also appropriate because the mere presence of identical source code does not necessarily mean that the software is identical. *See* Billett Decl. ¶ 30 (describing the concept of "commented out" source code).

**23.** For purposes of this comparison, PlayMedia's expert, Professor Karplus, compared WINAMP 2.7.6, the most current version available at the time he made the comparison on June 7, 2001, with AOL's Media Player. Karplus Decl. ¶ 34. AOL criticizes PlayMedia for using the "wrong version" of WINAMP for purposes of its graphical user interface comparison. Biggs Decl. ¶ 14. PlayMedia responds that WINAMP 2.7.6 has the same features as WINAMP 2.6.2, and AOL does not state otherwise. Billett Decl. ¶ 26.

RealPlayer engine were used for content playback." Biggs' Decl. ¶ 12. In other words, an AOL Media Player user sees the same interface whether s/he is playing audio or video files. In contrast, WINAMP uses an interface that "mimics a standard stereo system." Frankel Decl. ¶ 5.

This basic difference between the two programs helps explain why WINAMP's interface includes a number of "stereo system" features that the Media Player does not. For example, WINAMP includes a spectrum analyzer and oscilloscope on its face. The AOL audio player does not. Karplus Decl. ¶ 39. WINAMP includes an equalizer, which modifies output levels for various frequency ranges. The AOL audio player does not include an equalizer. Karplus Decl. ¶ 42. There are multiple windows in WINAMP that dock seamlessly. The AOL audio player does not have multiple windows. Karplus Decl. ¶ 41. Playlist management is different in the two programs. Karplus Decl. ¶ 43. WINAMP includes a minibrowser, but the AOL audio player does not. Karplus Decl. ¶ 44. *See also* Billett Decl. ¶¶ 33–46.

WINAMP also permits users to change the "skin" of the interface, which changes the appearance of the player. Karplus Decl. ¶ 37. The ability to change the interface skin is "one of the features of Winamp most important to its users." *Id.* AOL's audio player uses an interface that does not have changeable "skins." *Id.* ¶ 38.

AOL would have the Court ignore these "ancillary" features because even if all of these features are taken away, WINAMP would still play back audio files. Moreover, AOL asserts, many of WINAMP's versions do not include some of these features.[24] Therefore, in AOL's view, their absence in AOL's audio player does not necessarily establish the absence of WINAMP.

The Court credits the declaration of Dr. Brian Billett, a PlayMedia expert who is intimately familiar with WINAMP, both in terms of its software structure and its outward appearance. Billett Decl. ¶ 52. Dr. Billett states that "the character, look, features, and internal composition of [WINAMP] have remained largely unchanged [from version to version], although they have been incrementally improved through updates." *Id.* ¶ 52. Moreover, *all* versions of WINAMP—including the minimal installation—use the MP3 decoder in conjunction with the main executable, winamp.exe.

In addition, even though WINAMP could play back an audio file without all of the "ancillary" features, from the perspective of the user, those features are what make WINAMP unique. There is a sufficient basis in the record, and common sense dictates, that consumers do not choose WINAMP from the various competing audio players purely because of its ability to play an audio file, but at least in part because of its appearance and its functionality. As PlayMedia analogizes it, to dismiss these features as ancillary to WINAMP's main function is comparable to "telling an audiophile that his expensive stereo system is the same as a record player that does not even have a volume or balance control." PlayMedia RTQ at 4.

The Court is persuaded that the feature set provided by the main program, winamp.exe, must be a part of the determination whether WINAMP is present in AOL's audio player. The near-complete absence of those features in AOL's Media Player helps demonstrate that AOL is not

---

**24.** *See supra* note 20 (explaining that the Court will not consider comparisons of the AOL Media Player to WINAMP version 0.20a).

using AMP in a way intended by the parties to the Licensing Agreement.

## F. *Conclusion*

 PlayMedia has demonstrated probable success in proving that AOL is not using the AMP MP3 decoder "in conjunction with WINAMP," as required by the Licensing Agreement. AOL's "core functionality" test is flawed because it ignores the extent to which winamp.exe is really at the heart of the inquiry whether WINAMP is present in AOL's audio player. Determining whether winamp.exe is present in AOL's audio player, in turn, requires the Court to compare the two programs' source code, resource files, and functions.

The source code and resource file comparison help convince the Court that AOL is not using the AMP MP3 decoder "in conjunction with WINAMP." Only 8% of WINAMP's main executable program is present in the corresponding main executable program in the AOL audio player. The AOL audio player uses *none* of WINAMP's resource files. AOL's main executable needs a significant amount of source code written by AOL to operate. That a court in a different context could conclude that AOL derived its main executable program from winamp.exe does not mean that AOL is using AMP "in conjunction with WINAMP" in a manner intended by the parties. AOL's assertion that its Media Player incorporates a "nearly identical" version of WINAMP 2.6.2 clearly is incorrect. Moreover, PlayMedia has provided evidence that winamp.exe is a part of every version of WINAMP, and AOL has not rebutted this evidence by showing that a comparison of its main program, ampx.dll, with the main program of a different version of WINAMP would yield a different

result. In addition, as the preceding section demonstrates, insofar as users would be likely to view it, the AOL Media Player does not function much like WINAMP. These comparisons all weigh heavily in PlayMedia's favor. For these reasons, PlayMedia has demonstrated a likelihood of success as to this issue.

## IV.

## IS THE AMP OBJECT CODE BEING USED IN CONJUNCTION WITH WINAMP ONLY?

### A. *PlayMedia's Contentions*

PlayMedia's position is simple. Incorporating AMP into a product other than WINAMP was beyond the scope of the license and in violation of the restrictions on sublicensing. The sublicensing grant states: "NULLSOFT shall have the right to sublicense AMP or derivatives thereof in object code form only for use in conjunction with WINAMP only." PlayMedia argues that "[a]s written, the word 'only' in the [sub]license follows the word 'WINAMP' and is a limitation on the product with which AMP may be sublicensed. It means, in plain English, that AMP may be sublicensed for use in connection with WINAMP, *and no other product.*" Reply at 13; emphasis in original. According to PlayMedia, the "AMP® decoder in AOL 6.0 can *only* be used in conjunction with the entire AOL 6.0 application." Billett Decl. at ¶¶ 47–50.[25] AOL 6.0 is not "Winamp only" and thus, AOL's sublicensing of the AMP®/Nitrane code for use in conjunction with AOL 6.0 exceeds the license.

During the 1999 PlayMedia–Nullsoft negotiations, the original form of the license proposed by Nullsoft did not contain a product restriction on AMP. Van Dalsem

---

**25.** At the hearing, AOL's witness, David Biggs, admitted that the code contained in the AOL folder ("AmpX" in Exh. 38) in which

AMP and the plug-ins reside does not work by itself; it cannot operate except in conjunction with the entirety of the AOL program.

Supp.Decl. ¶¶ 6, 7. Rather, Nullsoft proposed that PlayMedia grant it an "unrestricted" license to use the AMP source code. *Id.* ¶ 6. PlayMedia's lawyer, Bruce Van Dalsem, removed the "unrestricted" language and added two product restrictions to Nullsoft's ability to sublicense AMP. Van Dalsem Supp.Decl. ¶ 14. First, he restricted Nullsoft to sublicensing AMP "in object code form only." Van Dalsem explains that he added this restriction because "PlayMedia did not want Nullsoft to be able to sublicense AMP in source code form." *Id.* ¶ 15. PlayMedia wanted to preclude sublicensees from modifying the AMP source code and making new software products from it. AOL RTQ at 9. As the Court understands it, if Nullsoft could distribute that source code to third parties, that would make it easier for such parties to modify AMP because programmers write programs in source code. Object code is source code "translated" into instructions that a computer can understand (represented by binary or hexadecimal numbers), and cannot readily be used for programming. Karplus Decl. ¶¶ 14–16. At the very least, a programmer would have to go through many technical steps to translate object code back to source code.

Second, Van Dalsem limited Nullsoft's right to sublicense AMP "for use in conjunction with WINAMP only." Van Dalsem explained his intent in adding this restriction:

> Limiting Nullsoft's right to sublicense AMP "for use in conjunction with WINAMP only" was intended to mean that Nullsoft could sublicense AMP for use in conjunction with Winamp only and could not sublicense AMP for use in conjunction with any product other than Winamp.

Van Dalsem Supp.Decl. ¶ 15. Van Dalsem explained that the word "only" was not included in the general use grant because

> PlayMedia was less concerned with how Nullsoft used the AMP source code internally and for development purposes, and we therefore allowed for the possibility that during the development of Winamp, there might be circumstances when the AMP code would be used in conjunction with some software other than Winamp, such as for testing purposes. PlayMedia was more concerned with what Nullsoft released to the public. Since software is typically not "sold" to a consumer, but is licensed for use by a consumer, limiting the right to sublicense AMP "for use in conjunction with Winamp only" limited to Winamp the consumer product in which AMP could be used.

*Id.*

### B. *AOL's Contentions*

AOL also proceeds from a simple premise: the Licensing Agreement does not say that AMP cannot be licensed with software other than WINAMP. To that basic observation it adds the argument that if WINAMP could not incorporate the AMP decoder for use in conjunction with any other software program, WINAMP could not function and the license would be illusory. AOL RTQ at 6. The AMP decoder must always be embedded in and run in conjunction with other software, such as BIOS,[26] DOS,[27] and Windows. WINAMP could not launch the decoder to play music without such higher level programs. In-

---

**26.** "BIOS, which stands for Basic Input/Output System, is software built into the computer and determines what a computer can do without accessing programs from a disk. For example, BIOS contains code required to control the keyboard, display screen, disk drives, serial communications, and several other miscellaneous functions." AOL RTQ at 1.

**27.** "DOS refers to Disk Operating System and is the basic operating software for PCs." AOL RTQ at 1.

deed, WINAMP always has been and must be embedded in and used in conjunction with other software programs, such as Windows and support libraries such as zlib and ATL. AOL RTQ at 12. Moreover, contends AOL, PlayMedia contemplated that Nullsoft would have to use the AMP decoder in this manner.[28]

With AOL 6.0, the only time that the AMP MP3 decoder is used is when the user launches the so-called "Winamp engine." No other program in AOL 6.0 uses the AMP MP3 decoder. AOL therefore contends that the AMP code is being used "in conjunction with WINAMP only." According to Mark Kittredge, the attorney who negotiated the Licensing Agreement on behalf of Nullsoft, all of the product restrictions added by PlayMedia—including the "in conjunction with WINAMP only" restriction—were "inserted into [the Licensing Agreement] to address PlayMedia's stated concern that, without those terms, Nullsoft would be able to distribute or license the AMP decoder or its derivatives to third parties as a separate product by itself and in direct competition with PlayMedia." Kittredge Decl. ¶ 3. (This assertion is inconsistent with Van Dalsem's assertion that the addition of the "Winamp only" product restriction was "independent of the issue of head-to-head competition using the AMP code." Van Dalsem Supp. Decl. ¶ 9.) Kittredge states that "at no time did PlayMedia claim that the language of the agreement and license mean that Nullsoft's Winamp software products ... containing the AMP decoder could not be distributed along with other software programs." Id. ¶ 4; see also AOL RTQ at 6. AOL contends that because neither AOL 6.0 nor the Media Player are "Stand Alone Products," i.e. products that are not distributed with WINAMP or a WINAMP derivative, AOL has not exceeded the scope of the sublicensing grant of the license.

### C. *PlayMedia Has Established Probability of Success Concerning the "In Conjunction With WINAMP Only" Test*

 As with the previous section, principles of contract law guide the Court's analysis of whether AOL has exceeded the scope of the license. *Mendler,* 207 F.3d at 1121; *King Features,* 843 F.2d at 398. The parties disagree about the meaning of the phrase "in conjunction with Winamp only." The first step in contract interpretation is to look at the "plain meaning" of the contract language. " 'When interpreting contract language, courts start with the assumption that the parties have used the language in a way that reasonable persons ordinarily do.' " *Mendler,* 207 F.3d at 1121 (quoting E. ALLAN FARNSWORTH, CONTRACTS § 7.11 (1990)). Under California law, the parties may rebut this assumption by introducing extrinsic evidence to demonstrate that the contract language is "reasonably susceptible" to a meaning other than the "ordinary" meaning, even if the ambiguity does not appear on the face of the contract. *King Features,* 843 F.2d at 398 (citations omitted). "However, if after considering extrinsic evidence the court finds the language of the contract is not reasonably susceptible to the asserted interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract." *Id.* (refusing to consider extrinsic evidence to vary ordinary meaning of contract terms where extrinsic evidence did not demonstrate that

---

**28.** At the hearing on this motion, Bruce Van Dalsem, the lawyer who represented PlayMedia in 1999 in the negotiations with Nullsoft, testified that during the negotiations PlayMedia contemplated that Nullsoft might be acquired by a much larger company, possibly Microsoft.

the contract terms were susceptible to a different meaning); *see also Barris Industries, Inc. v. Worldvision Enterprises, Inc.*, 875 F.2d 1446, 1450–51 (9th Cir.1989) (extrinsic evidence inadmissible because it did not show that otherwise "unambiguous" contract language was "reasonably susceptible" to a different meaning); *Zenger–Miller, Inc. v. Training Team, GmbH*, 757 F.Supp. 1062, 1067–68 (1991) (holding that "preliminary consideration" of defendants' extrinsic evidence did not "render the contract susceptible of two interpretations" and was therefore inadmissible to vary otherwise unambiguous terms of contract).

AOL asserts that "in conjunction with Winamp only" means that AOL may use AMP with any product it chooses, so long as it is simultaneously and exclusively accessed by the WINAMP program. The Court finds that this construction is not consistent with ordinary understanding. As PlayMedia correctly points out,

> Putting aside for the moment that the remnants of Winamp code contained in the AOL Media Player do not transform that player into Winamp, the premise of AOL's argument is flawed. AOL attempts to rewrite the license so that the word "only" in the license follows and modifies the word "use." That is not correct. As written, the word "only" in the license follows the word "Winamp" and is a limitation on the product with which AMP® may be sublicensed. It means, in plain English, that AMP® may be sublicensed for use in conjunction with Winamp, *and no other product. See e.g. Farrell v. Commissioner of Internal Revenue*, 136 F.3d 889, 895 (2d Cir.1998) (the plain meaning of "only" has the purpose and effect of excluding the remaining universe); *Shell Oil Co. v. Manley Oil Corp.*, 124 F.2d 714, 715 (7th Cir.1941) ("[t]he word 'only' is a limiting and restrictive term ... and in that sense means 'solely' or

the equivalent of the phrase 'and nothing else.' ")

Here, the logic of the sentence provides the point. The word "only" is actually used twice in the sentence; first as a limitation to "object code form" and second as a limitation to "Winamp," in both instances meaning "and nothing else."

AOL's attempt to rewrite the license would render the word "only" superfluous because the "use" of AMP® is already limited to "use" "in conjunction with Winamp" by the general grant of the license. Adding the word "only" in the context of "use" would be superfluous because the grant only allows "use" of AMP® "in conjunction with Winamp" in the first instance. Similarly, if AOL were correct that the license permitted it to sublicense AMP® for use in conjunction with *both* Winamp *and* AOL 6.0 so long as the AMP® code was invoked in conjunction with Winamp code, there would be no reason for the word "only" to follow the word "Winamp" in the sublicensing provision.

Reply at 13–14.

Under California law, AOL is permitted to introduce extrinsic evidence to demonstrate that the phrase, "in conjunction with Winamp only," is "reasonably susceptible" to an alternate meaning. The only extrinsic evidence introduced by AOL to prove an alternate meaning is the declaration of Mark Kittredge, who states that PlayMedia never claimed that the phrase "in conjunction with Winamp only" "meant that WINAMP containing the AMP decoder could not be distributed with other software programs." Kittredge Decl. ¶ 4. This extrinsic evidence, however, is insufficient to demonstrate that the otherwise unambiguous language of the contract is reasonably susceptible to AOL's asserted meaning. Accordingly, this evidence is

not admissible to vary the ordinary meaning of the terms of the Licensing Agreement.

AOL also raises a practical objection to PlayMedia's interpretation of the Licensing Agreement: If the Licensing Agreement is interpreted consistent with PlayMedia's proffered meaning, the license to the AMP code that Nullsoft obtained is worthless because WINAMP must be embedded in a larger software program—such as an operating system—in order to work. If the license is interpreted to prohibit AOL from using AMP in WINAMP and *also* in conjunction with AOL 6.0, then it must similarly be interpreted to prohibit AOL from using AMP in WINAMP and also in conjunction with Windows, for example. AOL argues that PlayMedia itself could not possibly have intended this result, and that in fact PlayMedia understood that AOL would and could embed WINAMP (containing AMP) in a larger software program such as AOL 6.0.[29]

In their impressive presentations, the parties at times invoked a common analogy. They likened WINAMP to a car and the AMP source code to the car's engine; the license explicitly permitted the use of the engine only in conjunction with a car. This court believes it is helpful to amplify on that analogy. Of course, a car (WINAMP) cannot run without its engine (AMP). Nor can the engine (AMP) take someone anywhere without being installed in the car (WINAMP). Although the parties did not clearly provide whether they contemplated that the car could be driven on streets and highways, surely they did contemplate such use, for without roads, cars are pointless. Similarly, just as permission to use an engine in a car entails use of a road system, so does use of AMP in WINAMP contemplate use in a Windows operating environment, because in the world of computers it is inconceivable that anything can run without an operating system. That is, in this analogy Windows corresponds to roads, and therefore it is not surprising that the parties did not explicitly authorize WINAMP to be used in conjunction with Windows.

But the question before this Court is: What if the car has to be transported by means other than being driven directly on a roadway? Suppose it is an official car, such as the President's, required for a motorcade in another city? Or a vintage racing car to be brought to the Speedway in Indianapolis for an exhibition? Consistent with the license, could the car be placed on a railroad train that carries cars (a "car train") and transported via a larger railway system? That is, under this license could WINAMP be placed on the AOL Media Player and embedded into a larger system (AOL) that is not intrinsically essential to its operation?

In effect, PlayMedia says "no." It argues that the license permits AOL to use the engine (AMP) in the car (WINAMP) for driving on roads—and nothing more. AOL, in contrast, argues that the real question is not where WINAMP goes but where AMP is placed. So long as the

**29.** AOL points out that in addition to the "music plug-ins" necessary to decode particular audio file formats and output them on users' computers, many WINAMP versions work in conjunction with other types of optional "plug-in" software components, such as those allowing a user to change the interface ("general plug-ins"), to add special sound effects ("DSP" components), to adapt to different computer sound systems ("audio output" components) and to provide visual effects ("visualization" components). Immediately prior to the issuance of the license, there were numerous such optional software programs which worked in conjunction with versions of WINAMP that included the Nitrane decoder. These could be considered examples of embedding in ancillary or "third-party add-on" applications.

engine (AMP) is in the car (WINAMP), there is no prohibition on it being carried on a car train (*i.e.*, embedded in the AOL Media Player) that is transported via the large AOL system.

The Court rejects AOL's arguments. The evidence provided by Mr. Van Dalsem is persuasive. First, from a grammatical and "plain language" perspective, the placement of the concluding "only" means just what it says. Second, his account of the Nullsoft–PlayMedia negotiations is largely unrefuted. It shows that PlayMedia sought to avoid precisely what it is now confronted with: the uncompensated use of AMP through the embedding of a WINAMP variant in a product (the AOL Media Player) that has many millions of customers. Although it may not be part of PlayMedia's business to sell AMP to AOL's subscribers directly, PlayMedia undoubtedly views such persons as potential, albeit indirect, customers, whose patronage of the services that AOL provides, such as the Media Player, could generate license fees. In short, from a practical standpoint, PlayMedia's proffered construction of the language "in conjunction with Winamp only" makes sense. Third, embedding WINAMP in AOL's system is unlike using AMP in the Windows operating system, because the latter is essential in order for WINAMP to function at all, whereas WINAMP does not need AOL to function.

For these reasons, the Court finds that PlayMedia has demonstrated the probable success of its arguments concerning the sublicense.

## V.

### *OTHER REQUIREMENTS FOR INJUNCTIVE RELIEF*

**A.** *Irreparable Injury*

■ Having established the likelihood of proving that AOL exceeded the scope of the Licensing Agreement, PlayMedia satisfies this element. As the Ninth Circuit has stated,

> Under federal copyright law . . . a plaintiff that demonstrates a likelihood of success on the merits of a copyright infringement claim is entitled to a presumption of irreparable harm. *See Cadence Design Systems v. Avant! Corp.*, 125 F.3d 824, 826–27 (9th Cir.1997), *cert. denied*, 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998). That presumption means that "the balance of hardships issue cannot be accorded significant—if any—weight in determining whether a court should enter a preliminary injunction to prevent the use of infringing material in cases where . . . the plaintiff has made a strong showing of likely success on the merits." *Id.* at 830.

*Sun Microsystems v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir.1999).

Even without this presumption, PlayMedia could qualify for injunctive relief if it succeeds in demonstrating "that an injunction is warranted under the traditional standard for preliminary injunctions, in which the court balances the likelihood of success against the relative hardships to [the plaintiff] and [the defendant]." *Id.* at 1123. Merely because the injury is compensable in money damages is no grounds to avoid applying it. *Cadence*, 125 F.3d at 827.

■ The presumption of irreparable injury for copyright infringement is not easily rebutted. Factors that are relevant to rebutting the presumption are:

● The plaintiff unreasonably delayed bringing its motion for preliminary injunction. *Cadence* at 829. AOL argues that PlayMedia is guilty of such delay, but the Court finds that PlayMedia acted reasonably.

• The parties are not in competition with each other. *Cadence*, 125 F.3d at 828 (*dicta*). While that is the case here, the absence of competition, standing alone, is not enough to rebut the presumption. *See Beckman Instruments, Inc. v. Cincom Sys., Inc.*, 1998 WL 783774, at *1 (9th Cir.1998) (*unpublished*).

• Whether defendant's free speech interests are at stake in that the injunction would restrain something other than "the distribution of an average commercial product." *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 n. 10 (9th Cir.1995) (*citing Belushi v. Woodward*, 598 F.Supp. 36 (D.D.C.1984)). This factor is not present here.

### B. *Balance of Hardships*

#### 1. *AOL's Contentions*

 Most of AOL's arguments proceed from the premise that PlayMedia is seeking a mandatory injunction. As previously noted, one element of relief that PlayMedia seeks would preclude AOL from "permitting any user of the AOL service from completing an online 'session' on the AOL service without AMP being removed from the user's copy of AOL 6.0 by means of an AOL online 'live update.'" PlayMedia concedes that this relief "might be construed as mandatory" and that if so a "heightened standard applies to the issuance of [the requested] injunction. *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir.1994)." Reply at 3. As the *Stanley* court stated, "[w]hen a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id.* (citation omitted). PlayMedia correctly argues, however, that the heightened standard is applicable only to that portion of the re-

quested relief that is mandatory in nature. *Daishowa Int'l v. North Coast Export Co., et al.*, 1982 WL 1850, at *7 (N.D.Cal.1982).

AOL claims that it has approximately $39 million of AOL 6.0 promotional materials, including software disks onto which the software is burned, that were prepared for distribution to the public. Gimpert Decl. ¶ 2. If the remedy required or entailed the destruction of these disks, contends AOL, it would lose "an estimated … tens of millions of dollars." *Id.* ¶ 3. The basis for this figure is not clearly established, however, and PlayMedia objects to this evidence as lacking foundation.

AOL also contends that if it were required to retrieve or replace all copies of AOL 6.0, numerous computer manufacturers would have to return to AOL some 4.2 million copies of free 6.0 CDs and obtain replacements. That would cost some $12.6 million. If AOL were to replace the software, rather than just retrieve it, the cost would be an additional $2.1 million. Ewert Decl. ¶ 2. And if AOL had to remove software from computers onto which original equipment manufacturers (OEM) already have copied AOL 6.0, that would cost an additional $12–15 million. *Id.* ¶ 3. Again, however, AOL provides no foundation or factual basis for these figures.

Finally, AOL asserts that to disable or replace the Nitrane MP3 decoder currently in use on existing subscribers' computers would require it to deliver a "tool on demand (TOD)" to some 10 million AOL subscribers.[30] That would risk destabilizing those users' computer programs, would disrupt their service and would cause dissatisfaction within the customer base. Biggs Decl. ¶ 17. AOL contends that it

---

**30.** AOL defines a TOD as "a software update that is delivered by download to accomplish some minor fix to the software that is current-

ly on members' computers and it is usually delivered at the beginning or end of a user's session." Biggs Decl. ¶ 16.

would take at least three months to develop and deliver a TOD. *Id.* ¶ 18.

### 2. *PlayMedia's Contentions*

PlayMedia proffers a very different assessment of the impact on AOL of a "fix," and suggests an ostensibly neat solution. PlayMedia points out that AOL does not dispute that the AMP/Nitrane decoder can be removed and replaced by a TOD. PlayMedia argues that if a TOD were used to remove the AMP code, users could still use existing AOL 6.0 disks, and existing installations of AOL 6.0 on outstanding computers could remain. According to PlayMedia,

> AOL acknowledges that since October, 2000, [the stand-alone version of] Winamp has employed an MP3 decoder other than AMP/Nitrane.[31] ... The new MP3 decoder in Winamp has been tested extensively in no less than eight versions of Winamp and has been downloaded and installed on millions of computers. Billett Decl. at ¶ 60 and Exhibit 84 ... The computer file containing the AMP/Nitrane decoder can be deleted from AOL 6.0 and the new Winamp MP3 decoder copied into its place. When this is done, the AOL Media Player functions perfectly when playing MP3 files and in all other respects. PlayMedia's expert has performed this decoder file replacement test on a variety of Windows operating systems ... The MP3 decoder swap works every time. Billett Decl. at ¶¶ 58–63. A computer script to perform the swap is simple and would install

quickly as a TOD. Billett Decl, at ¶ 61–62.

Reply at 20.

As to the promotional materials and software disks, PlayMedia states that the injunction it seeks would not prohibit the use of existing promotional materials and that according to AOL itself the 6.0 disks are soon to be rendered obsolete anyway because of the imminent release of the next generation of software, AOL 7.0.[32]

### 3. *The Balance of Hardships Does Not Preclude Entering a Preliminary Injunction*

■ The parties have presented no evidence as to how many TODs AOL issues per month, their average size, the percentage of all AOL users they affect and the extent (if any) to which the TODs cause problems that prompted customers to call customer support, much less terminate their subscriptions. This information, presumably, was readily available to AOL. But the evidence before the Court has demonstrated that the plug-ins at issue in this case are relatively small, even in the context of computer software. That means, in turn, that it takes precious little time to implement a TOD. PlayMedia's expert, Dr. Billett, estimated it would take 15 seconds for most dial-up users. Therefore, the risk of creating widespread customer dissatisfaction is small.

Similarly, given the relative frequency of TODs generally and the fact that the plug-in architecture that characterizes WINAMP reduces the likelihood of errors that could affect other features of the software, the litany of horrors that AOL recites appears to be exaggerated. Moreover, the

---

**31.** What AOL said in the cited reference is that "Winamp version 2.6.5 was the last version to use the Nitrane MP3 decoder; subsequent versions have used a different decoder."

**32.** Under the language of its proposed preliminary injunction order, PlayMedia sought to enjoin AOL from distributing the 7.0 application if it contained AMP source code. AOL represented during the hearing that the 7.0 version would not contain such code.

financial costs of removing the infringed material are too speculative to warrant withholding relief.

Having found that PlayMedia qualifies for preliminary injunctive relief under the general *Cadence* standard anyway, the Court concludes that weighing the hardships does not warrant a different result. This conclusion is reinforced by the indisputable fact that AOL is the dominant Internet service provider and a key constituent business of a giant telecommunications conglomerate.

### C. *Bond*

Having considered the parties' contentions concerning possible damage to AOL in the event this injunction is overturned or plaintiff ultimately fails to prevail, the Court finds that a bond in the amount of $500,000 is appropriate.

### PRELIMINARY INJUNCTION ORDER

Defendant America Online, Inc., its subsidiaries, distributors, officers, agents, servants, employees and all those acting in concert with them or at their direction, are enjoined during the pendency of this action, from:

(a) copying the AMP® computer software owned by Plaintiff PlayMedia Systems, Inc. or any derivative of the AMP® computer software including without limitation Nitrane (collectively "AMP®") into AOL 6.0 or any other computer software application other than Winamp;

(b) creating derivative works based upon AMP® other than for use in conjunction with Winamp;

(c) distributing AMP® with AOL 6.0 or any other computer software application other than Winamp;

(d) purporting to license to any third party the right to copy, distribute or in any other manner use any version of AOL 6.0 that contains AMP®; and

(e) permitting any user of the AOL service from completing an online "session" on the AOL service without AMP® being removed from the user's copy of AOL 6.0 by means of an AOL online "live update."

IT IS FURTHER ORDERED that AOL shall notify all licensees of AOL 6.0 of the issuance of this injunction.

A bond in the amount of $500,000 shall be sufficient security for this injunction. IT IS SO ORDERED.